# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
### November 20, 2013 Session

## LEANN BARNES v. DAVID ELLETT BARNES

**Direct Appeal from the Chancery Court for Bedford County**
**No. 27833      J. B. Cox, Chancellor**

---

**No. M2012-02085-COA-R3-CV - Filed April 10, 2014**

---

Following a five-day divorce trial, the trial court valued and divided the parties' sizeable marital estate, awarded $6,000 per month in alimony in futuro to Wife, and declined to award attorney's fees to either party. On cross-motions to alter or amend, the trial court altered its division of marital property as to several assets, and it modified the alimony award from $6,000 per month in alimony in futuro to $4,300 per month in rehabilitative alimony for four years. Wife then filed another post-trial motion, pro se, which the trial court denied. Wife appeals. We affirm in part, reverse in part, and remand for such other proceedings as may be necessary.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Chancery Court Affirmed in Part, Reversed in Part and Remanded**

ALAN E. HIGHERS, P.J., W.S., delivered the opinion of the Court, in which DAVID R. FARMER, J., and HOLLY M. KIRBY, J., joined.

Stephen W. Pate, Murfreesboro, Tennessee, for the appellant, Leann Barnes

Daryl M. South, Murfreesboro, Tennessee, for the appellee, David Ellett Barnes

## OPINION

### I. FACTS & PROCEDURAL HISTORY

LeAnn Barnes ("Wife) and David Barnes ("Husband") met in 1983, while Wife was attending nursing school and Husband was attending dental school in Memphis, Tennessee. They married about a year later, in June 1984, just one week after Wife graduated from nursing school. Wife was twenty-one years old at the time and immediately went to work as a nurse. Husband was twenty-three years old and continued to attend dental school for two years after the parties married. He also joined the United States Navy as a reserve officer while in dental school. After Husband graduated from dental school in 1986, he went into active duty and was assigned to a branch dental clinic in Meridian, Mississippi. Husband was a practicing dentist lieutenant there for three years, until he left active duty in 1989. The parties then moved to Shelbyville, Tennessee.

After the parties moved to Tennessee, Wife worked as a registered nurse at a local hospital. Husband joined an existing dental practice in Shelbyville. In 1992, Husband and Wife had a daughter. Both Husband and Wife continued to work.

In 1994, five years after the parties moved to Tennessee, Husband and Wife decided that Husband would "go out on his own" and open his own dental practice. Wife quit her job at the hospital and went to work with Husband at his new practice, Shelbyville Family Dentistry. She worked at the office daily, answering the telephone, scheduling appointments, making personnel decisions, and handling bookkeeping matters including payroll, accounts receivable and accounts payable. After working at the dental practice in this capacity for about three years, Wife returned to her previous job at the hospital in 1997, and she also continued to do bookkeeping for Husband's dental practice from home.

The parties separated and instituted divorce proceedings in 2003, but they reconciled in 2005, before the proceedings concluded, and the case was dismissed. In 2008, Wife began working only four days per week at her nursing job instead of full-time; she quit working on Fridays because Husband did not work on Fridays either. According to Wife, shortening her work-week allowed her and Husband to travel for "long weekends" and spend more time together.

On July 1, 2009, not long after the parties' twenty-fifth wedding anniversary, Wife filed for divorce again. Husband answered and filed a counter-complaint for divorce. By this time, the parties had accumulated a sizeable marital estate. They owned the marital residence, several other real properties, the dental practice, numerous retirement and investment accounts, a twin-engine airplane, several vehicles and all-terrain vehicles, a

-2-

motorcycle, a ski boat, a collection of antiques, and numerous other assets. The divorce proceedings were lengthy and contentious.[1] Numerous petitions for contempt were filed, a mutual temporary restraining order was entered, and the trial court appointed a receiver to identify and inventory the parties' assets.

A five-day divorce trial was held from April 26 to May 2, 2011. The trial court heard from fifteen witnesses and received 161 exhibits. On August 26, 2011, the trial court entered a final decree of divorce, incorporating a previous memorandum opinion, which granted both parties a divorce on grounds of adultery. The trial court identified the parties' separate and marital property and assigned values to the disputed items of marital property. After dividing most of the marital estate, the court determined that Husband had, to that point, received a slightly larger portion of the marital assets, and therefore, the court awarded Wife a slightly larger share of the parties' retirement accounts in order to make the overall distribution mathematically equal. The trial court's memorandum opinion included a seven-page analysis of the issue of alimony, with the court specifically discussing the application of each statutory factor and making detailed findings as to each. Based upon this discussion, the court awarded Wife alimony in futuro in the amount of $6,000 per month, finding that Husband "makes and can make" $400,000 per year and that Wife makes "around $50,000" per year, and therefore, she "is not able to be rehabilitated" and "will not be able to improve her earnings in such a way that she will keep pace with the [Husband's] ability to earn." The court declined to award attorney's fees to either party, finding that each party was in a position to pay his or her own attorney's fees due to the division of marital assets.

Both parties filed motions to alter or amend the final decree of divorce. As a result, the trial court entered an order amending the final decree in part, to the extent that the court altered its previous valuation of several marital assets, mostly in ways that benefitted Husband, and it deducted just over $100,000 from Wife's share of the retirement accounts to make up the difference. The trial court also altered its award of alimony, upon considering the Tennessee Supreme Court's recent decision in *Gonsewski v. Gonsewski*, 350 S.W.3d 99 (Tenn. 2011). The trial court modified its previous award of $6,000 per month in alimony in futuro to an award of $4,300 per month in rehabilitative alimony for four years, finding that its previous alimony award was inconsistent with *Gonsewski*, that Wife is "capable of earning at least $75,000.00 if she worked full time," and that its new award would "allow the wife an opportunity to rehabilitate herself if she chooses to do so."

After entry of the amended order, Wife, acting pro se, filed a lengthy and somewhat difficult to follow "Motion to Amend or Make Additional Findings of Facts And Motion to

---

[1] The parties' daughter turned eighteen during the divorce proceedings, and there are no issues related to child support or custody at issue on appeal.

Alter and Amend the Judgment." The motion itself spanned fifteen pages, and Wife attached over 200 pages of exhibits. The trial court entered an order denying Wife's motion on August 30, 2012, and Wife filed a notice of appeal to this Court on September 24, 2012.

## II. ISSUES PRESENTED

Wife presents the following issues, slightly reworded, in her brief on appeal:[2]

1. Whether the trial court erred in amending the final decree of divorce to alter the alimony award from $6,000 per month in alimony in futuro to $4,300 per month in rehabilitative alimony for four years;
2. Whether the trial court erred in its division of the marital estate;
3. Whether the trial court erred in failing to order Husband to pay Wife's attorney's fees.

Husband, in his posture as appellee, presents the following additional issue for review:

4. Whether it is appropriate to dismiss Wife's appeal as untimely filed.

For the following reasons, we decline to dismiss the appeal as untimely. The decision of the trial court is affirmed in part and reversed in part, and this matter is remanded for such further proceedings as may be necessary.

## III. DISCUSSION

### A. Timeliness of Wife's appeal

We will consider Husband's issue first because it involves a challenge to the jurisdiction of this Court to consider this appeal. As noted above, both parties filed motions to alter or amend after the trial court entered its final decree of divorce, which resulted in the trial court entering an amended order on June 11, 2012. On June 15, 2012, Wife filed her lengthy pro se "Motion to Amend or Make Additional Findings of Facts And Motion to Alter and Amend the Judgment." The trial court denied Wife's motion on August 30, 2012, and Wife filed a notice of appeal to this Court on September 24, 2012.

On appeal, Husband argues that the "gravamen" of Wife's pro se motion was a request for relief pursuant to Rule 60, and therefore, having already filed a motion to alter or amend,

---

[2] Both parties are represented by counsel on appeal, but the parties' trial counsel differed from appellate counsel.

-4-

which had been resolved, Wife's pro se motion was unauthorized by the Rules of Civil Procedure and did not operate to extend the time for filing a notice of appeal. Husband concedes in his brief that he filed a motion to dismiss this appeal as untimely, shortly after the appeal was filed, and upon considering Wife's response, the Middle Section of this Court entered an order denying Husband's motion to dismiss on December 3, 2012. Specifically, the Middle Section stated,

> Tenn. R. App. P. 4(a) requires parties to file a notice of appeal with the trial court clerk within thirty days after the entry of the final judgment. If one of the post-judgment motions listed in Tenn. R. App. P. 4(b) and Tenn. R. Civ. P. 59.01 is timely filed, the time for filing the notice of appeal will run from the date of the order granting or denying the motion. Motions to reconsider such post-judgment motions are not authorized and filing post-judgment motions in serial fashion will not extend the time for filing the notice of appeal. Tenn. R. Civ. P. 59.01; *Southern Co-op Development Fund Inv. Corp. v. Gilliam*, App. No. 01A01-9112-CV-000302, 1992 WL 104752 (Tenn. Ct. App. May 19, 1992) (Perm. App. Denied August 24, 1992).

> The husband contends the wife's June 15, 2012 [pro se] motion was a motion to reconsider a Tenn. R. Civ. P. 59 motion, was not authorized by Tenn. R. Civ. P. 59 and did not extend the time for filing the appellant's notice of appeal. The husband thus asserts the thirty day time period for filing the notice of appeal ran from June 11, 2012, and expired on July 11, 2012. We agree with the husband that Tenn. R. Civ. P. 59.01 prevents a party from filing successive or serial post-trial motions. It does not, however, prevent a party from filing a Tenn. R. Civ. P. 52.02 motion to make additional findings of fact or a Tenn. R. Civ. P. 59.04 motion to alter or amend with respect to a judgment that has been changed in response to another party's Tenn. R. Civ. P. 59 motion. *Albert v. Frye*, 145 S.W.3d 526, 528 (Tenn. 2004); *Savage v. Hildenbrandt*, M1999-00630-COA-R3-CV, 2001 WL 1013056 at *8 (Tenn. Ct. App. Sept. 6, 2001); *Brenneman v. Brenneman,* M2000-00890-COA-R3-CV, 2001 WL 543434, at *3 (Tenn. Ct. App. May 23, 2001) (No Tenn. R. App. P. 11 application filed).

> If the wife's [second] motion merely sought reconsideration of the denial of her first Tenn. R. Civ. P. 59 motion, the motion would not be authorized by Tenn. R. Civ. P. 59 and would not extend the time for a notice of appeal. Having reviewed the wife's [second] motion, however, we conclude that the motion seeks, in part, relief related to the portion of the June 11, 2012 judgment that was changed in response to the husband's Tenn. R.

Civ. P. 59 motion. Accordingly, at least a portion of the motion was authorized by Tenn. R. Civ. P. 59 and operated to extend the time for filing a notice of appeal.

Accordingly, the Court denied Husband's motion to dismiss this appeal.

Husband's brief on appeal states that he "is mindful of this court's ruling" denying his motion to dismiss, but, he nevertheless argues that the majority or "gravamen" of Wife's second motion was one for relief under Rule 60, so he again asks this Court to dismiss Wife's appeal "after consideration of [his] brief and argument." At oral argument before this Court, counsel for Husband suggested that the Middle Section's order denying his motion to dismiss the appeal indicated or at least suggested that the Court's ruling was only preliminary and that the issue could be addressed again in the parties' briefs. Wife disagrees, claiming that it would be a waste of judicial economy and the parties' resources for the Court to enter an order denying the motion to dismiss, only to reconsider the issue after the parties have submitted briefs on all issues and attended oral argument.

We find nothing in the Middle Section's order to suggest that its ruling was preliminary or subject to reconsideration. Due to the significant implications of this jurisdictional issue, however, we note our agreement with the previous decision of the Middle Section. Wife's pro se motion was inartfully drafted and attempted to raise a whole host of issues. However, she did challenge some of the trial court's findings made in its amended order, such as its findings that she was capable of earning $75,000 per year, and that she could be rehabilitated. Thus, Wife's second motion was not wholly related to Rule 60 relief, and at least part of her argument could be construed as a request for the trial court to alter its amended judgment. We therefore agree with the Middle Section's conclusion that the appeal should not be dismissed as untimely.

### B. Division of the Marital Estate

Next, we will consider Wife's issues regarding the division of the marital estate. The trial court classified the vast majority of the parties' property as marital property, holding that the parties' only separate property consisted of Husband's professional goodwill as a dentist, and Wife's jewelry and roughly $90,000 she had obtained from an inheritance. The court's property classifications are not challenged on appeal.

The trial court then assigned values to the numerous marital assets and debts and attempted to divide the marital estate as equally as possible, considering those values. However, Wife argues on appeal that many of the values assigned by the trial court were erroneously skewed in Husband's favor, which resulted in Husband receiving a much larger

portion of the marital estate.

Trial courts must place a reasonable value on marital property that is subject to division. *Kraus v. Thomas*, No. M2012-00877-COA-R3-CV, 2013 WL 2612458, at *10 (Tenn. Ct. App. Jun. 7, 2013); *Jacobsen v. Jacobsen*, No. M2012-01845-COA-R3-CV, 2013 WL 1400618, at *9 (Tenn. Ct. App. Apr. 5, 2013) (citing *Edmisten v. Edmisten*, No. M2001-00081-COA-R3-CV, 2003 WL 21077990, at *11 (Tenn. Ct. App. May 13, 2003)). "The parties have the burden to provide competent valuation evidence." *Kraus*, 2013 WL 2612458, at *10 (citing *Kinard v. Kinard*, 986 S.W.2d 220, 231 (Tenn. Ct. App. 1998)). If the parties' valuation evidence is conflicting, the trial court "may place a value on the property that is within the range of the values presented." *Id.* (citing *Watters v. Watters*, 959 S.W.2d 585, 589 (Tenn. Ct. App. 1997)).

"'The value of marital property is a fact question.'" *Ramsey v. Ramsey*, No. E2012-01940-COA-R3-CV, 2013 WL 5827648, at *3 (Tenn. Ct. App. Oct. 29, 2013) (quoting *Wallace v. Wallace*, 733 S.W.2d 102, 107 (Tenn. Ct. App. 1987)); *see also Kinard*, 986 S.W.2d at 231. As a result, the trial court's finding as to the value of a marital asset "'will be given great weight on appeal.'" *Ramsey*, 2013 WL 5827648, at *3 (quoting *Wallace*, 733 S.W.3d at 107). In accordance with Tennessee Rule of Appellate Procedure 13(d), the trial court's decision with regard to the valuation of marital property "'will be presumed to be correct unless the evidence preponderates otherwise.'" *Id.* (quoting *Wallace*, 733 S.W.2d at 107).

### 1. The Dental Practice

The valuation of the dental practice was perhaps the most disputed issue at trial, at least with regard to the division of the marital estate. The dental practice was actually owned by a professional corporation, David E. Barnes, DDS, P.C., and Husband owned 100% of the corporation's stock. The dental practice itself, Shelbyville Family Dentistry, consisted of two dentists and nine other full-time employees: Husband, who had been with the practice since its inception 21 years earlier; an associate dentist named Dr. Chamberland, who had been employed at the practice for about 13 years; three dental hygienists; three dental assistants; and three front office staff. In 2003, Husband had been offered $913,000 to sell the practice, but he declined. Wife testified that Husband had listed his practice for sale at a price of $1.2 million. In 2006, Husband signed a net worth statement valuing his practice at $1 million. The annual net revenue of the corporation between 2005 and 2009 ranged from $1.48 to $1.74 million. Both Husband and Wife testified about the history of the practice, and both parties presented testimony from expert witnesses who had prepared extensive reports and reached opinions as to the value of the dental practice. In addition, Husband called another witness who had not personally valued the dental practice at issue, but who criticized the

valuation methodology used by Wife's expert.

Wife's expert calculated the value of the dental practice by using three different valuation methods – the summation of assets method, the gross revenue multiplier method, and the capitalization of earnings method – and then averaging the three values to arrive at the recommended practice value. Wife's expert then deducted from the practice value the amount of goodwill he attributed to Husband, personally, as opposed to the goodwill attributable to the enterprise. Wife's expert ultimately valued the dental practice at $678,179. He opined that this figure represented the total value of the practice's tangible assets and the goodwill attributable to the enterprise. However, Wife's expert stated that his valuation did not consider the debts owed by the dental practice, nor did it consider its cash or accounts receivable.

Husband's expert calculated the value of the professional corporation using an asset-based approach and also an income-based approach, for comparison, but Husband's expert ultimately relied upon the income-based approach (specifically, the capitalized cash flow method) in reaching his final opinion as to the value of the practice. Husband's expert valued the corporation at only $50,000. He explained that it actually had a "deficit net worth" because its debt obligations exceeded its assets, and he concluded that the enterprise had little to no valuable goodwill because neither Dr. Barnes nor the associate dentist who is employed there, Dr. Chamberland, was subject to a non-compete agreement. Husband's expert also reduced the value of the corporation by 15% due to lack of marketability.

The trial court ultimately valued the dental practice at $328,392. The court gave a detailed explanation for its valuation:

> The Husband is awarded the dental practice and it is valued at $328,392.00. The Court has weighed the testimony of all the witnesses, especially the expert witnesses who valued the business and has weighed the limitations of the analysis of the experts to reach the valuation arrived at by the Court.
> The Court gives greater weight to the valuation given by the Husband's expert in that it takes into fuller consideration the debts of the practice and the value of the accounts receivable of the practice. The Husband's expert has greater industry data to back up his valuation and his data is benchmarked better than the data of the Wife's expert. The Wife's expert's opinion is lacking in that it does not consider the debts of the practice and is arbitrary in its approach to the standards applied to come up with the value of the practice. The goodwill not attributable to the two (2) dentists that participate in the practice appears to this Court to be understated in the Wife's expert's analysis.

The goodwill of the practice according to the Wife's expert appears to this Court to be overstated given the tenuous nature of the practice and the lack of an agreement not to compete with the other dentist in the practice. The Court gives less weight to the "offer" on the practice from the past for this very reason. Dr. Chamberla[nd] and all the staff are free to leave at any time.

The Court's review of the report of the Husband's expert revealed that it had not considered the value of Dr. Chamberl[and] in its analysis and had lumped Dr. Chamberl[and] into the total figure for the valuation of a non compete which was subtracted from the total value to arrive at the initial value of $57,044.00. The Court finds that the total figure attributable to the non-competes should be adjusted by the ratio of time of service of Dr. Chamberl[and] to the time of service of Dr. Barnes. Said another way the Court took the $677,796.00 adjustment and reduced it by the non-compete amount attributable to Dr. Chamberl[and] or 12/21 of the total value. This calculation netted an adjustment in value of $348,496.00, which left an income approach value of $386,343.00[.] The Court then applied the lack of marketability discount of fifteen percent (15%) attributable to the practice via the Husband's expert opinion to reach the value of $328,392.00.

On appeal, Wife briefly argues, in one sentence, that the trial court's "valuation did not consider almost $90,564 in accounts receivables due at the time of trial."[3] However, *Wife's* own expert testified at trial that *he* did not include the value of accounts receivable in *his* valuation of the dental practice because, he explained, accounts receivable generally are not included in the value of a practice, as they are personal to the dentist selling the practice. Wife does not cite to any location in the record where she suggested that accounts receivable *should* have been included in the trial court's valuation of the dental practice, and since her expert testified to the contrary, she cannot now complain that the trial court's valuation was erroneous based upon this issue. *See* **Ramsey**, 2013 WL 5827648, at *4 (stating that the burden is on the parties to produce competent evidence of the value of a marital asset, "and the parties are bound by the evidence they present"); *see also* Tenn. R. App. P. 36(a) (stating that this Court is not required to grant relief "to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error"). We also note that the trial court's order specifically states that the court gave greater weight to *Husband's* expert's opinion because "it takes into fuller consideration the debts of the practice *and the value of the accounts receivable* of the practice." (Emphasis added). Thus, we find no basis for granting Wife relief based upon her cursory argument that the trial court's valuation of the practice should have included accounts receivable.

---

[3] Wife does not cite any legal authority regarding this issue.

Next, Wife argues that the trial court erred in applying a 15% lack of marketability discount to the valuation of the dental practice, which equated to a deduction of $57,951 from the practice value assigned by the trial court. The trial court simply noted that it made this deduction "via the Husband's expert opinion." Husband's expert had similarly applied a 15% lack of marketability discount to his valuation of the practice. His report explained that the concept of marketability deals with the liquidity of an interest, that is, how quickly a business ownership interest can be converted to cash at the owner's discretion. For example, the report noted that a minority interest in a publicly traded company is generally considered to be a liquid investment because a shareholder can order a trade and receive cash in three days at minimal cost. On the other hand, the report explained, the time and cost required to liquidate an interest in a closely held corporation is longer and more difficult to estimate, so an interest in a closely held business is not liquid in comparison to other investments. According to the report, investors prefer liquid assets over non-liquid assets. Thus, Husband's expert's report found a 15% discount for lack of marketability to be appropriate in this instance, based upon its review of various studies, as well as factors specific to this particular dental practice.

Wife argues that it was inappropriate for the trial court to apply a marketability discount according to *Bertuca v. Bertuca*, No. M2006-00852-COA-R3-CV, 2007 WL 3379668 (Tenn. Ct. App. Nov. 14, 2007). That case involved an appeal from a divorce action, where the husband owned a 90% interest in a partnership that operated several McDonald's franchises. With regard to the value of this interest, for purposes of dividing the marital estate, the husband presented testimony from an expert who opined that it was appropriate to apply a twenty percent marketability discount to the husband's interest in the partnership. *Id.* at *4. The trial court declined to reduce the value of husband's interest in that manner, and the husband argued on appeal that the trial court had erred in failing to consider a deduction for the non-marketability of his interest. *Id.* The Court of Appeals disagreed. At the outset of its analysis, the Court explained that the value of a *public* corporation is most reliably determined using a market value method because there is an established market for the corporation's stock, which will enable the court to arrive at the price a willing buyer would pay for the stock. *Id.* at *5. However, the stock in *closely held* corporations is rarely traded (like partnerships), so "it may be improper to attempt to place a value of a closely held corporation or partnership interest using the method generally used to place a value on a public corporation." *Id.* (citing *Anderson v. Anderson*, No. E2005-02110-CO-R3-CV, 2006 WL 2535393, at *3 (Tenn. Ct. App. Sept. 5, 2006)). While "fair market value" is typically one of the methods employed in the valuation of a public corporation, where there is an established market for the stock, "fair market value is typically not a reasonable method for valuing a closely held corporation, because the stock is rarely traded and there is no 'market'." *Id.* (citing *Wallace*, 733 S.W.2d at 107). The Court determined that, for valuing the particular partnership interest at issue, it was appropriate to

use a capitalization of income approach, based upon the earnings value of the partnership. *Id.* at *7. The Court held that its valuation "would not be impacted by the lack of marketability of Mr. Bertuca's interest unless it appeared from the record that his needs or situation were such that a sale of his interest would be necessary or desirable." *Id.* Because there was no indication in the record that Mr. Bertuca had any intention of selling his interest in the partnership, the Court concluded that "the value of the business is not affected by the lack of marketability and discounting the value for non-marketability in such a situation would be improper." *Id.* (citing *Anderson*, 2006 WL 2535393, at *4).

In *Anderson*, 2006 WL 2535393, at *2, which was cited by the Court in *Bertuca*, an expert valuing a husband's interest in a company for divorce purposes similarly applied a 10% "marketability discount" to the husband's interest, which he said was what it would cost to market the husband's business interest for sale, in terms of advertising, broker fees, etc. The Court of Appeals reversed the trial court's valuation to the extent that it included the 10% discount, finding it "inappropriate because no sale was ordered and there [was] no indication in the record that the husband ha[d] any intention of selling his minority stock." *Id.* at *4. Consequently, the Court of Appeals removed the 10% reduction from the value of the stock and increased the trial court's valuation by that amount. *Id.* *See also Yates v. Yates*, No. 02A01-9706-CH-00122, 1997 WL 746377, at *3-4 (Tenn. Ct. App. W.S. Dec. 4, 1997) (declining to discount the value of a husband's stock in a closely held corporation for lack of marketability).

Considering the reasoning of these cases, we likewise find that the trial court erred in applying a 15% discount for lack of marketability to the value of Husband's interest in the dental practice. Husband's expert, and also the trial court, utilized an income-based approach to valuing the dental practice, and the Court in *Bertuca* used an earnings-based approach. The trial court's valuation should not have been impacted by the lack of marketability of Husband's interest, unless of course there was some indication that a sale of his interest was necessary or desirable. Because Husband had no intention of selling his interest in the corporation, "the value of the business is not affected by the lack of marketability and discounting the value for non-marketability in such a situation would be improper."[4] *Bertuca*, 2007 WL 3379668, at *7 (citing *Anderson*, 2006 WL 2535393, at *4). The effect of the trial court's 15% discount for lack of marketability was that the trial court deducted $57,951 from the practice value to reach a final value of $328,392. Therefore, this same amount should be added back to the practice value, for a total practice value of $386,343.

---

[4] Interestingly, on cross-examination, Husband's expert acknowledged that, based upon his understanding of the *Bertuca* case, it is inappropriate to apply a lack of marketability discount in the context of valuing an interest simply for a divorce settlement. However, he did not explain why he chose to apply a lack of marketability discount in this case.

This results in an additional $57,951 in marital property having been awarded to Husband. Based upon the trial court's stated intention to divide the marital estate as closely to equal as possible,[5] we find that Husband should pay to Wife an amount equal to one-half of this increased value in marital property, or $57,951 divided by two, which equals $28,975.50. On remand, the trial court should decide how Wife should be compensated for this additional award.

Wife's final argument with regard to the dental practice is that the trial court's valuation was "extremely low given the amount of income produced by the company on an annual basis." In response, Husband points out that the trial court specifically found his expert more convincing, and he claims that Wife is simply second-guessing the trial court's discretionary valuation of a marital asset. Husband "recognizes" in his brief that this Court would be justified in affirming the trial court's valuation, but he also argues that, if anything, the trial court's valuation of the practice should be reduced to $50,000 in accordance with the opinion of his expert, since the trial court apparently found him to be most credible. We find that neither party presents a cogent argument as to why the trial court's valuation is erroneous. Neither party challenges the trial court's method of valuation or any of the figures it used.[6] They essentially argue that the trial court's valuation was simply too high or too low. As we stated earlier in this opinion, when the parties present conflicting valuation evidence, the trial court "may place a value on the property that is within the range of the values presented." *Kraus*, 2013 WL 2612458, at *10. The trial court's finding as to the value of a marital asset is given great weight on appeal, and it is presumed to be correct unless the evidence preponderates otherwise. *Ramsey*, 2013 WL 5827648, at *3. We also recognize that "'determining the value of a closely held corporation is not an exact science[.]'" *Inzer v. Inzer*, No. M2008-00222-COA-R3-CV, 2009 WL 2263818, at *4 (Tenn. Ct. App. July 28, 2009) (quoting *Wright v. Quillen*, 909 S.W.2d 804, 809 (Tenn. Ct. App. 1995)). "[T]here are a number of acceptable methods available to determine the value of a corporation," and "[t]he choice of the proper method or combination of methods depends upon the unique circumstances of each corporation." *Fickle v. Fickle*, 287 S.W.3d 723, 731-732 (Tenn. Ct. App. 2008) (quoting *Powell v. Powell*, 124 S.W.3d 100, 104 (Tenn. Ct. App. 2003)). Neither party has demonstrated that the evidence preponderates against the trial court's valuation, with the exception of Wife's argument specifically related to the discount

---

[5] The trial judge stated during the hearing on the cross-motions to alter or amend, "My intent on property division was to get as close to a 50/50 division as was practically possible. That is still my intent."

[6] We note that Husband does cite *Nicholson v. Nicholson*, No. M2010-00042-COA-R3-CV, 2010 WL 4065605, at *6 (Tenn. Ct. App. Oct. 15, 2010), where this Court addressed "the correct method for valuing a sole practitioner dental practice," but the case before us does not involve a sole practitioner dental practice.

for lack of marketability. Therefore, we discern no error in the trial court's valuation aside from that limited issue.

## 2. Personal Property in the Marital Home

Next, Wife takes issue with the trial court's valuation of the personal property located in the marital home. She points out that the trial court valued the personal property at $181,000, which was an average of the parties' valuations presented through their respective appraisers, with Wife's appraisal being $83,435 and Husband's being $276,920. Wife argues, without citation to the record or legal authority, that "by taking an average of the two appraisals, this drastically skews the margin of an equitable distribution." Again, we find that Wife cannot complain about this issue because of the position she took at trial. Wife's counsel specifically stated to the trial judge, on the first day of trial, that the parties had reached an agreement as to the value of certain assets. He referenced Exhibit 7, being Wife's statement of assets and debts, and items number 33 and 34 on that list, being the household furnishings located in the marital home and in the home where Husband was residing. Counsel stated, "we've agreed the value of those items will be the average of the two appraisals." Counsel for Husband agreed, reiterating "everything that we have competing appraisals on for the same thing, he'll take at the average value." On the second day of trial, Wife was asked about the agreement, and specifically, whether the household furnishings would be valued "at the average value of the two appraisals if we had two appraised values," and Wife responded, "Yes." Then, on the fourth day of trial, the attorneys referenced their agreement again. The trial judge stated his understanding of the agreement as, "Whatever it is, if it's appraised, take an average of the appraisals," to which counsel for Wife responded, "Correct, Your Honor. . . . That agreement will apply to the household furnishings, which are item 33; it will apply to the household furnishings, which are item 34 . . . . Now, all those items will be taken at the average value." Based upon this clear agreement that the household furnishings would be valued at the average of the two appraisals, we find no error in the trial court's valuation in accordance with the parties' agreement.

## 3. Regions Bank Loan of $34,295

Next, Wife appears to challenge the trial court's decision to deduct a certain marital debt from Husband's share of the assets.[7] She mentions that the trial court deducted several marital debts from Husband's column in the total division of the marital estate, and then

_____

[7] Because Wife's brief raises a single issue regarding the division of marital property, simply stated as "Whether the trial court erred in the division of the marital estate," it is difficult to discern her precise arguments with regard to the numerous assets and debts at issue.

adds, "Wife testified that she believed the debt owing to Regions Bank in the amount of $34,295.00 was consolidated with the loan owing to First Community Bank."

We can find no basis for granting relief to Wife based upon this issue. First of all, we are not aware of any "debt owing to Regions Bank in the amount of $34,295.00," as described in Wife's brief. The marital debts included more than one loan at Regions Bank and more than one loan at First Community Bank. At trial, there was some discussion of a $34,295 loan at *First Community Bank* (acct #9617), but not at Regions. Husband testified that the $34,295 loan at First Community Bank was a personal line of credit, and he presented a bank account summary showing a balance on the #9617 loan of $34,295 as of April 24, 2011, just two days before trial. In Wife's proposed division of marital property, submitted to the trial court as Exhibit 65, she specifically proposed that Husband should be assigned the $34,295 loan from First Community Bank.

In any event, however, we find nothing in the divorce decree that addresses a $34,295 debt. Both parties' briefs on appeal contain a Rule 7 table of assets and debts, and both show a $34,295 loan being assigned to Husband. However, Wife does not cite to the record to indicate where such an award was made, and Husband cites to a page of the divorce decree that does not mention a $34,295 loan.

Based upon Wife's brief's failure to properly identify the loan to which she refers, and the failure of either party to direct us to an order addressing this loan, we find no basis for addressing this issue further.

### 4. Regions Bank "Equipment Loan"

Next, Wife argues that the trial court erred in deducting a $182,436 debt from Husband's column in the division of the marital estate. Wife argues that this was an "equipment loan in the amount of $182,436.00," constituting "business debt." Wife basically argues that Husband was credited twice for assuming this business debt because the trial court stated that it gave greater weight to Husband's expert's valuation of the dental practice, in part, because it took "into fuller consideration the debts of the practice." Thus, she claims that the court effectively deducted the business debt in its valuation of the dental practice and again as a marital debt assigned to Husband.

Wife testified at trial that Husband should be responsible for this loan, and she included the full loan balance of $182,436 in her proposed division of the marital estate, in Husband's column. Wife testified that the $182,436 loan included the debt on the parties' airplane, two lines of credit, and "Patterson Dental Equipment." Aside from the fact that not all of the loan was attributable to dental equipment, Husband points out that this was in fact

a personal indebtedness, and not one owed by the business. The deed of trust executed in connection with the loan was executed by David E. Barnes ("Husband") rather than David E. Barnes, DDS, P.C. Wife does not cite to any portion of the record to demonstrate that this was in fact a "business debt," and in fact, her proposed division of marital assets specifically lists this as a debt belonging to "Husband." Furthermore, Wife does not cite to any part of the lengthy valuation report prepared by Husband's expert where he allegedly included the $182,436 loan in his valuation of the practice, and we are not aware of any discussion of this debt in the report. For all these reasons, we find no merit in Wife's assertion that Husband was actually credited with assuming the $182,436 debt via two separate aspects of the marital property division.

### 5. $57,000 Attributed to Wife

Wife next argues that the trial court erred in altering its property division, in response to the cross-motions to alter or amend, by charging her with receiving $57,000 in marital property during the divorce proceedings. After the trial court entered its final decree of divorce, Husband argued in his motion to alter or amend that there were "unaccounted for funds" that Wife received during the parties' separation that should have been attributed by the court "as an asset to wife." Husband had argued during the divorce trial that such an award was appropriate, but the court did not address the issue in its original divorce decree.

At trial, Husband called his sister, Margee Barnes Belk, to testify, as she had been doing bookkeeping for his dental practice for the past two months and had also reviewed Wife's checking and savings account statements. Ms. Belk testified that, based upon her review of these documents, Wife had received income from four sources during the divorce proceedings, which spanned nearly two years: $62,350 in salary from her employment as a nurse; $67,000 in withdrawals from an account that contained an inheritance (undisputed as Wife's separate property); alimony pendente lite that Wife received during the proceedings in the amount of $1,000 per week, totaling $93,889; and Husband's reimbursements to Wife for the utility bills at the marital residence, which he had been ordered to pay, and which totaled $10,652. According to Ms. Belk, Wife received a total of $233,892 from these four sources of income during the divorce proceedings, but based upon Ms. Belk's review of Wife's checking and savings account statements, she calculated that Wife had only deposited $131,171 in those accounts during that same period of time. Thus, Ms. Belk testified that there was a sum of $102,790 that was "unaccounted for." At the hearing on the motion to alter or amend, counsel for Husband conceded that the $67,000 Wife withdrew from the inheritance account was her separate property, but he argued that "the other 50-something-thousand-dollars, that she got through the alimony is on her side, too, because she can't account for it." He argued that there was a burden on Wife to demonstrate how she spent the funds she received, and that she had failed to prove how she spent "that other $57,000 she

was getting for alimony and employment." He argued, "She needs to have that dollar amount either explained where it went or she ought to be put on her tally." (sic) The trial judge questioned counsel for Husband about how, in his view, the $57,000 became "transformed from alimony which was paid into marital fund[s]," to which counsel responded, "I know of no case that says alimony received, it becomes a separate property of the recipient." At the conclusion of the hearing, the trial judge announced, "As it relates to the issues of the . . . receipt of alimony of $57,000, the Court would be amenable to taking the 57,000 off of her side[.]" Consequently, the trial court's amended order "charged" Wife with "the receipt of an additional $57,000" in marital property, and it reduced her previous award from the parties' retirement accounts by a corresponding amount.

On appeal, Wife argues that it was improper for the trial court to charge her with the receipt of $57,000 in marital property because she failed to "account" for the alimony she received during the divorce proceedings. She argues, first, that given the parties' incomes, it would be impossible to perform an accounting of all expenditures made during the context of the divorce. She further argues that Husband was not required to "account" for the marital funds or earnings he spent for his own support during the divorce proceedings. Wife points out that Husband admitted to cashing over $50,000 in checks during the parties' separation without accounting for where he spent the money, and that Husband admittedly spent marital funds, while the divorce proceedings were pending, on vacations, gifts, and basic necessities for his live-in girlfriend.

Neither party has cited any legal authority in support of their arguments regarding this issue. Tennessee Code Annotated section 36-4-121(b)(1)(A) provides that marital property is to be "valued as of a date as near as reasonably possible to the final divorce hearing date." Wife testified that none of the disputed funds remained in her possession at the time of trial, and Husband failed to prove otherwise. Wife testified that she spent the withdrawal from her inheritance on her attorney's fees, and that she only had $15 in cash.[8] Although Husband argued that the salary and pendente lite alimony Wife received during the divorce proceedings constituted marital property to be divided, not surprisingly, he did not offer to account for the expenditures he made for his own support during the divorce proceedings, nor did he suggest that the marital funds he used for his own support during that same time period should be returned to the marital estate for distribution. Because the trial court's $57,000 award effectively required Wife to "account" for funds she spent during the divorce proceedings, without imposing the same requirement on Husband, we find that it was

---

[8] We note that there was no allegation in this case of dissipation of marital assets. We also note that, while Husband argued at trial that Wife had a safe where she was hoarding money, the trial court made no finding to that effect, and the trial judge specifically noted during the hearing on the motion to alter or amend that he was not making the $57,000 adjustment based on the argument regarding the safe.

inappropriate to "charge" Wife with the receipt of $57,000 in marital funds. The result of the trial court's decision to "charge" Wife with the receipt of $57,000 in marital property was that the court deducted $57,000 from Wife's previous award from the parties' retirement accounts. We find it appropriate to vacate the $57,000 marital property adjustment made in the amended decree, but we will let the trial court decide, on remand, whether to re-instate the original award to Wife of an additional $57,000 from the retirement accounts, or to compensate Wife in another manner, after hearing from the parties.

### 6.   $19,002 Investment Account

Wife's next argument centers on another alteration to the original divorce decree that the trial court made in response to Husband's motion to alter or amend. The issue involves a certain investment account with a balance of $19,002. The circumstances surrounding this account arise out of a dispute that occurred early in the divorce proceedings.

The divorce complaint was filed on July 1, 2009. On October 28, 2009, Wife filed a petition for criminal contempt against Husband, arguing, among other things, that he had violated an injunction by removing $54,112.91 from an investment portfolio without Wife's consent or leave of court. Wife asked that Husband be required to "reinstate" the funds to the original account. In response, Husband claimed that the funds were used to pay for the parties' daughter's private school tuition, to replace a wrecked motor vehicle, "and for incidental purchases to supply needed living items for the Husband and daughter, who have been unable to live at [the marital residence] since the beginning of this litigation."

Following a hearing, the trial court entered an order finding Husband in criminal contempt but declining to impose sanctions. Regarding the $54,112.91 withdrawal from the investment portfolio, the order states:

> [T]he court allows husband to expend the sum of $15,600 for the parties['] minor child's [private school] tuition, $8,600 for husband's deposit in establishing a new residence, $3,600 for rent, and miscellaneous expenses in setting up a new household, not to exceed $10,000, with the court finding that husband should reinvest the balance which is around $19,000 into the Thoroughbred Financial Services LLC account, within fifteen days of date of the hearing. All expenses as paid by husband, as allowed by the court, can be offset in the division of the marital estate at the final hearing.

-17-

The trial court subsequently entered another order, which provided "for the sake of clarification," that:

> [H]usband may borrow any necessary funds in order to reinvest the sum of $19,000.00 into the Thoroughbred Financial Services LLC account, consistent with the prior order of this Honorable Court . . . . Any expense and/or debt related to this issue may be considered an offset in the division of the marital estate at the final hearing.

In the final decree of divorce, the trial court awarded the $19,002 in the Thoroughbred account to Wife. Husband argued in his motion to alter or amend that those funds should have been awarded to Husband and claimed that "[i]t was stipulated in a previous hearing and Court Order that he would be allowed to recoup those funds." Husband contended that the $19,002 investment account "represents the money borrowed by husband when he had to replace funds to set up the residence for himself and the parties' minor child," and he claimed that he "should be awarded that investment account to offset the loan he borrowed to establish the investment account."

At the hearing on the motion to alter or amend, the parties' attorneys had differing interpretations of the trial court's previous orders. Counsel for Husband interpreted the orders to mean that if Husband proved at the final divorce hearing that it was necessary for him to expend the $19,000 sum for the purpose of setting up a household for himself and the parties' child, then he would be given "credit" for the $19,000 he was required to borrow and re-deposit. Husband argued that the effect of the trial court's original divorce decree was to assign to Husband the loan that he had obtained to replace the $19,000, but to award to Wife the proceeds of the loan – the funds in the $19,000 investment account. In contrast, Wife's counsel interpreted the trial court's previous orders to mean that Husband was authorized to expend the certain authorized sums on private school tuition, rent and deposits, but not the $19,000 balance. At the conclusion of the hearing, after both parties had presented their differing interpretations, the trial judge stated, "I meant to give him credit or to allow him to recoup on the amount of setting up that household in 19,000." The court clarified that the net result of its award would be that Husband would get the $19,000 in funds to go against the $19,000 loan. The trial court's amended order stated that Husband "shall be given credit in the sum of $19,000 regarding his expenditure to set up household. Such sum shall be reduced from his portion of the marital estate."

Upon reviewing the trial court's two orders, entered early in these proceedings, we find them to be ambiguous as to how the funds would be "offset in the division of the marital estate at the final hearing." We do not have a transcript of either of the two hearings that precipitated these orders, so we cannot know whether there was, as Husband claimed, a

stipulation that Husband would be allowed to recoup these funds. What we do have is the trial judge's clear statement, upon his consideration of the issue and the parties' differing interpretations, that it was his intention "to give [Husband] credit or to allow him to recoup on the amount of setting up that household in [the sum of] 19,000." We decline the invitation to interpret the trial court's orders any differently than the trial judge has done himself, especially given the fact that we have no transcript from the relevant hearings. Therefore, the trial court's ruling on this issue will not be disturbed.

### 7. $15,000 in Equity in Husband's Residence

The final argument raised by Wife with regard to marital property relates to a $15,000 interest in real property that the trial court initially awarded to Husband, but modified in response to the motion to alter or amend. At trial, Husband testified that he had moved into his current residence in July of 2009, when the divorce complaint was filed, and that he was still leasing it at the time of trial in May 2011. Husband testified that he originally had a one-year lease-purchase agreement on the house, and he put $5,000 "down" on the house and was initially paying $1,800 per month in rent. Husband testified that the one-year agreement had expired, and he and the landlord had extended the lease on a "gentlemen's agreement" for six additional months. According to Husband, his landlord informed him in March (approximately one month before trial) that he had to either pay more rent each month or buy the house, and Husband told his landlord that he could not buy the house until the divorce proceedings concluded. Husband said he and the landlord were currently "in an argument" because the landlord claimed that he had forfeited his right to the $15,000 he had already paid in "equity," and it was Husband's position that if he decided to purchase the house, he should still be entitled to recoup his $15,000 investment in the property. Husband said he expected that he would have to go to court in order to find out whether he would get credit for all the payments he had made on the house, and that he was currently debating whether the legal fees would make it worthwhile to fight over $15,000 in equity. In short, he said, "I don't know where I stand till I get a lawyer on that one."

In the initial divorce decree, the trial court's division of marital property attributed to Husband a $15,000 equity interest in his current residence. In his motion to alter or amend, Husband asked the court to "make additional findings of fact concerning the value" of Husband's current residence, but he did not present any argument to suggest that the court's valuation was erroneous. Then, at the hearing on the cross-motions to alter or amend, Husband's attorney briefly mentioned this issue, noting that, at the time of the divorce trial, the residence was considered a rental house and there was the potential for litigation involving the property. But, Husband's attorney went on to say to the trial judge, "In all candor, you know, within two months after you signed the order declaring them divorced, okay, then he went ahead and he bought [the residence]." Specifically, he said Husband had

ultimately decided to buy the house "rather than lose $20,000 of escrowed money." From our reading of the transcript, Husband's counsel did not present any argument to suggest that the trial court erred in addressing the $15,000 in equity in the final decree. Nevertheless, the trial judge announced at the conclusion of the hearing that he "may have committed error as it relates to [Husband's residence] . . . [b]ased on the timing[.]" The trial court's amended order reduced Husband's marital property interest in the residence from $15,000 to zero.

We find that the trial court's decision to eliminate the $15,000 marital property award to Husband was erroneous and should be vacated. Even if Husband's right to recoup his $15,000 investment in the property was subject to some debate or "argument" at the time of the divorce trial, due to the disagreement with the landlord, it was clear by the time of the hearing on the motion to alter or amend that Husband did have a $15,000 equity interest in the property, which he realized when he purchased the property shortly after the divorce. Therefore, we can perceive no basis for eliminating the divorce decree's $15,000 award to Husband at that juncture. We vacate the portion of the amended order that reduced Husband's interest in the property from $15,000 to zero and reinstate the marital property award from the original divorce decree.

However, the practical effect of this ruling is debatable. In the trial court's amended order, it announced the various ways that the court had altered its division of the marital estate, and one of those alterations included the court's decision to reduce Husband's interest in his current residence from $15,000 to zero. In the next paragraph, the trial court stated that its original division of marital property would be "amended pursuant to the rulings in the above paragraphs." The amended order stated that because these changes in value as to specific assets "provide for a different valuation as to the portion which each party would receive from the marital estate," the court's previous award from the retirement accounts would be amended as well. The trial court stated that Wife's portion of the retirement accounts would be "reduced by the sum of $101,300 pursuant to the court's amendment of the division of the marital property as contained within" the previous sections of the amended order addressing the specific assets at issue. The trial court did not specifically explain how it reached the total adjustment figure of $101,300, but from our review of the amended order, it appears that the $101,300 adjustment did not account for the trial court's $15,000 adjustment in Husband's equity in his residence. In the amended order, the trial court altered its original property valuation in the following ways that were to Wife's detriment:

(1)     it increased the value of the ski boat previously awarded to Wife by $30,000;
(2)     it charged Wife with receiving $57,000 in additional marital property due to her receipt of "unaccounted for" alimony;
(3)     it reduced Husband's share of the marital estate by $19,000 in order to

"credit" him for his expenditures to set up household; and

(4)    it eliminated the previous $15,000 equity interest in Husband's residence from his share of the marital property.

The trial court made two amendments that should have benefitted Wife:

(1)    It awarded Husband a $4,700 life insurance policy;
(2)    It awarded an all-terrain vehicle valued at $1,715 to the parties' daughter, when it had previously been awarded to Wife.

By our calculation, the $101,300 adjustment would only reflect three of the amendments to Wife's detriment ($30,000 + $57,000 + $19,000 = $106,000) and one of the amendments in Wife's favor ($106,000 – $4,700 = $101,300). Thus, it appears that the trial court did not reduce Wife's share of the retirement account due to its elimination of the $15,000 equity interest that had previously been awarded to Husband, or due to the alteration regarding the ATV.

Still, we are essentially left to speculate about how the trial court calculated its $101,300 adjustment due to the lack of an explanation from the trial court on this issue. Therefore, on remand, we find it appropriate for the trial court to consider whether its ruling on the $15,000 equity interest did impact its ultimate adjustment in Wife's share of the retirement account. If the trial court's ruling on the $15,000 equity interest did somehow prejudice Wife in a manner that is not apparent to this Court, and the trial court did reduce Wife's share of the retirement account due to this ruling, then the trial court should consider whether to further adjust the parties' shares of the retirement accounts in order to correct this error, or whether some type of alternate award is appropriate.

### 8.    Conclusion as to Marital Property

In conclusion, the trial court's division of marital property is affirmed on all issues with the following exceptions. We find that the value of the dental practice should not have been reduced by 15%, or $57,951, due to lack of marketability, and we hereby adopt the value reached by the trial court prior to the marketability reduction, which was $386,343. Because this results in Husband having received an additional $57,951 in marital property, Husband should convey to Wife an amount equal to one-half of that amount, and the trial court should consider on remand how to compensate Wife in this regard. We also find that the trial court erred in amending its original order to charge Wife with the receipt of $57,000 in marital property during the divorce proceedings and to eliminate the $15,000 equity interest it originally attributed to Husband in the division of marital property. On remand, the trial court should determine how to equalize the division of the marital estate considering

these two adjustments, meaning, whether it is appropriate to further adjust the parties' shares of the retirement accounts or to make some other award.

### C. *Alimony*

Having addressed the disputes as to marital property, we now move to the issue of alimony. As we discussed earlier in this opinion, the trial court's initial divorce decree awarded Wife $6,000 per month in alimony in futuro until her death or remarriage. The trial court's memorandum opinion included a seven-page discussion of the issue of alimony, and the court specifically considered each of the statutory factors and made express findings as to each. Husband then filed a motion to alter or amend, asking the court to reconsider its alimony award in light of the *Gonsewski* case, which the Tennessee Supreme Court had issued approximately three weeks after the final decree was entered in this case. Upon considering the *Gonsewski* case, the trial court found that its previous award of alimony in futuro was "inconsistent" with *Gonsewski*, and the *Crabtree* case cited in *Gonsewski*, so the trial court changed its award to rehabilitative alimony in the amount of $4,300 per month for four years. Thus, we will begin our analysis with the *Gonsewski* case.

In *Gonsewski v. Gonsewski*, 350 S.W.3d 99, 103 (Tenn. 2011), the divorcing parties had been married for 21 years. Both spouses worked throughout the marriage and were 43 years old at the time of the divorce. Wife had worked for the State of Tennessee for sixteen years in an information technology position, and in the year before the divorce, she earned a base salary of $72,000 in addition to a $1,500 longevity bonus. Husband was an accountant, and in the year before the divorce, his gross income was $137,418, which included an unusually large bonus of $33,115. *Id.* at 104. The trial court divided the marital estate fairly equally, with the wife receiving a slightly larger portion of the estate, and it determined that the wife was "not entitled to Alimony in Futuro or alimony for rehabilitative purposes," explaining that she had a stable job with the State, earned a good income, and that her share of the equity in the marital home was sufficient to find another residence. *Id.* The Court of Appeals reversed the trial court on the issue of spousal support and ordered the husband to pay the wife alimony in futuro in the amount of $1,250 per month until her death or remarriage, reasoning that there was no need for economic rehabilitation, given that the wife was a college graduate and had a steady career, but that alimony in futuro was "necessary to mitigate the harsh economic realities of divorce" due to the disparity in the parties' incomes. *Id.* at 104-105. The Supreme Court reversed the Court of Appeals and reinstated the judgment of the trial court, awarding no alimony. *Id.* at 105.

The ***Gonsewski*** Court began with a discussion of the appropriate standard of review that guides our analysis on appeal:

> For well over a century, Tennessee law has recognized that trial courts should be accorded wide discretion in determining matters of spousal support. See *Robinson v. Robinson*, 26 Tenn. (7 Hum.) 440, 443 (1846) ("Upon a divorce ... the wife is entitled to a fair portion of her husband's estate for her support, and the amount thus to be appropriated is a matter within the legal discretion of the chancellor...."). This well-established principle still holds true today, with this Court repeatedly and recently observing that trial courts have broad discretion to determine whether spousal support is needed and, if so, the nature, amount, and duration of the award. See, e.g., *Bratton v. Bratton*, 136 S.W.3d 595, 605 (Tenn. 2004); *Burlew v. Burlew*, 40 S.W.3d 465, 470 (Tenn. 2001); *Crabtree v. Crabtree*, 16 S.W.3d 356, 360 (Tenn. 2000).
>
> Equally well-established is the proposition that a trial court's decision regarding spousal support is factually driven and involves the careful balancing of many factors. *Kinard v. Kinard*, 986 S.W.2d 220, 235 (Tenn. Ct. App. 1998); see also *Burlew*, 40 S.W.3d at 470; *Robertson v. Robertson*, 76 S.W.3d 337, 340–41 (Tenn. 2002). As a result, "[a]ppellate courts are generally disinclined to second-guess a trial judge's spousal support decision." *Kinard*, 986 S.W.2d at 234. Rather, "[t]he role of an appellate court in reviewing an award of spousal support is to determine whether the trial court applied the correct legal standard and reached a decision that is not clearly unreasonable." *Broadbent v. Broadbent*, 211 S.W.3d 216, 220 (Tenn. 2006). Appellate courts decline to second-guess a trial court's decision absent an abuse of discretion. *Robertson*, 76 S.W.3d at 343. An abuse of discretion occurs when the trial court causes an injustice by applying an incorrect legal standard, reaches an illogical result, resolves the case on a clearly erroneous assessment of the evidence, or relies on reasoning that causes an injustice. *Wright ex rel. Wright v. Wright*, 337 S.W.3d 166, 176 (Tenn. 2011); *Henderson v. SAIA, Inc.*, 318 S.W.3d 328, 335 (Tenn. 2010). This standard does not permit an appellate court to substitute its judgment for that of the trial court, but " 'reflects an awareness that the decision being reviewed involved a choice among several acceptable alternatives,' and thus 'envisions a less rigorous review of the lower court's decision and a decreased likelihood that the decision will be reversed on appeal.'" *Henderson*, 318 S.W.3d at 335 (quoting *Lee Medical, Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010)). Consequently, when reviewing a discretionary decision by the trial court, such

as an alimony determination, the appellate court should presume that the decision is correct and should review the evidence in the light most favorable to the decision. *Wright*, 337 S.W.3d at 176; *Henderson*, 318 S.W.3d at 335.

*Id.* at 105-106.

The Court then discussed the different kinds of alimony available under Tennessee law. Alimony in futuro, also known as periodic alimony, is intended to provide support on a long term basis or until the death or remarriage of the recipient. *Gonsewski*, 350 S.W.3d at 107 (citing Tenn. Code Ann. § 36-5-121(f)(1)). "Such alimony may be awarded when the court finds that there is relative economic disadvantage and that rehabilitation is not feasible, meaning that the disadvantaged spouse is unable to achieve, with reasonable effort, an earning capacity that will permit the spouse's standard of living after the divorce to be reasonably comparable to the standard of living enjoyed during the marriage, or to the post-divorce standard of living expected to be available to the other spouse, considering the relevant statutory factors and the equities between the parties." **Tenn. Code Ann. § 36-5-121(f)(1).** The Court explained in *Gonsewski* that the concept of alimony in futuro is not a guarantee that the recipient spouse will forever be able to enjoy a lifestyle equal to that of the obligor spouse. 350 S.W.3d at 108 (citing *Riggs v. Riggs*, 250 S.W.3d 453, 456 n.2 (Tenn. Ct. App. 2007)). "In many instances, the parties' assets and incomes simply will not permit them to achieve the same standard of living after the divorce as they enjoyed during the marriage." *Id.* (citing *Robertson*, 76 S.W.3d at 340). Enabling the spouse with less income to maintain the pre-divorce lifestyle is a laudable goal, the Court said, but the reality is that two persons living separately incur more expenses than two persons living together. *Id.* (citing *Kinard*, 986 S.W.2d at 234). In most divorce cases, it is unlikely that both parties will be able to maintain their pre-divorce lifestyle. *Id.* "It is not surprising, therefore, that '[t]he prior concept of alimony as lifelong support enabling the disadvantaged spouse to maintain the standard of living established during the marriage has been superseded by the legislature's establishment of a preference for rehabilitative alimony.'" *Id.* (quoting *Robertson*, 76 S.W.3d at 340).

Rehabilitative alimony is a separate class of spousal support, as distinguished from alimony in futuro and other types of alimony.[9] **Tenn. Code Ann. § 36-5-121(e)(1).** "[R]ehabilitative alimony is intended to assist an economically disadvantaged spouse in acquiring additional education or training which will enable the spouse to achieve a standard of living comparable to the standard of living that existed during the marriage or the post-divorce standard of living expected to be available to the other spouse." *Gonsewski*,

---

[9] There are two other classes of alimony – transitional alimony and alimony *in solido* – but neither party argues that these types of alimony are appropriate in this case, so we have limited our discussion to alimony in futuro and rehabilitative alimony.

-24-

350 S.W.3d at 108 (citing Tenn. Code Ann. § 36–5–121(e)(1)). This type of alimony serves the purpose of assisting the disadvantaged spouse in obtaining additional education, job skills, or training, as a way of becoming more self-sufficient following the divorce. *Id.* (citing *Robertson*, 76 S.W.3d at 340–41; *Isbell v. Isbell*, 816 S.W.2d 735, 738–39 (Tenn. 1991)). Thus, the purpose of rehabilitative alimony "is markedly different than the purpose of alimony in futuro, which is to provide long-term support when the economically disadvantaged spouse is unable to achieve self-sufficiency." *Id.* (citing *Kinard*, 986 S.W.2d at 234).

When deciding whether to award spousal support, and, if so, determining the nature, amount, length, and manner of payment of alimony, courts consider several factors listed in Tennessee Code Annotated section 36-5-121(i). *Gonsewski*, 350 S.W.3d at 109-110. "The statutory framework for spousal support reflects a legislative preference favoring short-term spousal support over long-term spousal support, with the aim being to rehabilitate a spouse who is economically disadvantaged relative to the other spouse and achieve self-sufficiency where possible." *Id.* at 109 (citing Tenn. Code Ann § 36–5–121(d)(2)–(3); *Bratton*, 136 S.W.3d at 605; *Perry v. Perry*, 114 S.W.3d 465, 467 (Tenn. 2003)). The alimony statute states, "It is the intent of the general assembly that a spouse, who is economically disadvantaged relative to the other spouse, be rehabilitated, whenever possible, by the granting of an order for payment of rehabilitative alimony." **Tenn. Code Ann. § 36-5-121(d)(2).** Thus, there is a "statutory bias" toward awarding rehabilitative alimony over alimony in futuro. *Gonsewski*, 350 S.W.3d at 109. "While this statutory preference does not entirely displace long-term spousal support, alimony in futuro should be awarded only when the court finds that economic rehabilitation is not feasible and long-term support is necessary." *Id.* (citing *Bratton*, 136 S.W.3d at 605; *Robertson*, 76 S.W.3d at 341–42). "To be rehabilitated means to achieve, with reasonable effort, an earning capacity that will permit the economically disadvantaged spouse's standard of living after the divorce to be reasonably comparable to the standard of living enjoyed during the marriage, or to the post-divorce standard of living expected to be available to the other spouse, considering the relevant statutory factors and the equities between the parties." **Tenn. Code Ann. § 36-5-121(e)(1).**

Applying these principles to the facts before it in *Gonsewski*, the Supreme Court concluded that the Court of Appeals erred in awarding alimony in futuro to the wife. The Court found that the record before it was "silent on what, if anything, Wife could or could not do to alter her earning capacity to permit her standard of living after the divorce to be reasonably comparable to the standard of living during the marriage." 350 S.W.3d at 111. The parties had presented no evidence "regarding the prospect or feasibility of Wife making any 'reasonable effort'" to rehabilitate herself. *Id.* Aside from the parties' income and expense statements, there was "little evidence" presented regarding the parties' standard of living during the marriage, "whether lavish, frugal, or somewhere in between." *Id.*

Moreover, there was no evidence regarding the post-divorce standard of living expected to be available to the husband. *Id.* The Court said it was "not inclined to speculate about these matters, which relate directly to the statutory standard for awarding permanent alimony." *Id.*

What the record did show, the Court said, was that both parties were 43 years old at the time of trial and had college degrees, there were no minor children that hindered either party's ability to work, and neither party had a physical or mental condition that affected the alimony analysis. *Id.* The parties received comparable shares of the marital property, with the wife receiving slightly more than the husband. *Id.* The wife had a strong earnings record throughout the course of the twenty-one year marriage and was earning $72,000 a year (plus a longevity bonus) at the time of trial. *Id.* The husband earned an annual $99,900 base salary in addition to bonuses, but he testified that the bonuses were likely to decrease. The husband had also obtained loans to help the parties' children achieve a college education. *Id.* Both parties made equal contributions to the marriage, and Husband stipulated that Wife should be granted a divorce based upon his inappropriate marital conduct. *Id.* The Supreme Court pointed out that the trial court was aware of all of these facts when it denied the wife's request for alimony in futuro. Thus, viewing the evidence in the light most favorable to the trial court's decision, the Supreme Court found no abuse of discretion in the trial court's decision not to award alimony. *Id.* at 112. "In short," the Court said, "Wife has the ability to support herself and, absent an abuse of discretion, we are not inclined to second-guess the trial court's decision not to award alimony in futuro." *Id.* The Court recognized the "likelihood that Husband's income may continue to exceed Wife's by some extent, and that Wife's post-divorce lifestyle may decline to some extent," but the Court was "not willing to overrule the trial court on this basis." *Id.* at 112-13.

The *Gonsewski* Court also noted, toward the end of its discussion, that "the Court of Appeal's decision to grant alimony in futuro based on the facts of this case is inconsistent with this Court's decision in *Crabtree*," a case where the Supreme Court had held that an award of alimony in futuro was not justified. The Court said that the facts before it in *Gonsewski* offered "even weaker support for awarding alimony in futuro than the facts in *Crabtree*." 350 S.W.3d at 112. So, we will turn now to an examination of *Crabtree.*

In *Crabtree v. Crabtree*, 16 S.W.3d 356, 357 (Tenn. 2000), the parties were married 23 years, and the wife was 43 years old at the time of trial. After college, the wife had briefly worked full-time for an accounting firm, but after two years, she left her job to start a family. From then on, she worked part-time as an accountant from the marital home. In the year prior to the divorce, the wife earned $41,200 working thirty hours per week. The husband was a stockbroker, and in the six years prior to the divorce, his income varied between $230,000 and $417,000. Both spouses enjoyed good health. The husband admitted to adultery. The husband argued that the wife was only entitled to rehabilitative alimony

because of her earning capacity as an accountant. *Id.* at 358. The Supreme Court noted that the legislature had clearly demonstrated a preference for rehabilitative alimony by stating its intent that "'a spouse who is economically disadvantaged, relative to the other spouse, be rehabilitated whenever possible by the granting of an order for payment of rehabilitative, temporary support and maintenance.'" *Id.* (quoting Tenn. Code Ann. § 36-5-101(d) (1992)). Based upon this statute, the Court found "an obvious legislative policy to eliminate the dependency of one ex-spouse upon the other and to relieve the parties of 'impediments incident to the dissolved marriage.'" *Id.* at 359 (quoting *Self v. Self*, 861 S.W.2d 361 (Tenn. 1993)). The Court noted that alimony in futuro was to be awarded only when economic rehabilitation was not feasible and long-term support was necessary. *Id.*

At the time of the *Crabtree* decision, the relevant alimony statute did not specifically define what it meant to be "rehabilitated." The Court of Appeals in *Crabtree* had concluded that an award of rehabilitative alimony to the wife would "not place her anywhere near an equal footing with Husband nor [would] she be able to continue living in the manner in which she had become accustomed during this twenty-three year marriage." *Id.* The Supreme Court suggested that this was an incorrect analysis, stating that one of its previous cases involving alimony, upon which the Court of Appeals relied, was not meant to suggest "that every spouse should be entitled to be placed in the same financial condition occupied prior to the divorce." *Id.* at 359-60. The *Crabtree* Court found that awarding alimony in futuro to the wife was not justified and would not "recognize or further the legislative purpose of encouraging divorced spouses to become self-sufficient." *Id.* at 360. Instead, the Court found that rehabilitation was feasible, noting that Ms. Crabtree was a healthy 43-year-old college graduate who could compete in the workforce, and that the husband had testified that she could earn between $65,000 and $100,000. *Id.* The Court noted that its award of rehabilitative alimony would assist the wife in transitioning from part-time to full-time employment. *Id.*

In the case before us, the trial court specifically stated, "The Court in altering its judgment relies on how closely this case resembles *Crabtree v. Crabtree* 16 S.W.3d at 357 (Tenn.), cited in the *Gronsewski* [sic] decision." It is true that in both cases, the husband made over $400,000 in the year prior to trial, while the wife made just over $40,000 working part-time. However, we find that this fact alone does not command the same type of alimony award in the case at bar. A spousal support decision is "factually driven and involves the careful balancing of many factors." *Gonsewski*, 350 S.W.3d at 105 (citing *Kinard*, 986 S.W.2d at 235). "As Supreme Court Justice Henry once observed, 'Every tub must stand on its own bottom,'" which means, "[e]ach case is governed by its own facts and the application of the law to those facts." *Gorman v. Gorman*, No. M2010-02620-COA-R3-CV, 2011 WL 5599867, at *6 n.9 (Tenn. Ct. App. Nov. 16, 2011) (quoting *Farris v. State*, 535 S.W.2d 608, 622 (Tenn. 1976)). Moreover, "the precedential value of *Crabtree* must be considered in

light of later statutory revisions and caselaw." ***Gorman***, 2011 WL 5599867, at \*9 n.11. As the ***Gorman*** Court explained, after ***Crabtree***, the general assembly enacted revisions to the provisions of Tennessee Code Annotated section 36-5-101(d) governing alimony in 2003, and in 2005, the general assembly again revised the alimony provisions and moved them to Tennessee Code Annotated section 36-5-121. ***Id.*** at \*4 (citing 2003 Tenn. Pub. Acts ch. 305; 2005 Tenn. Pub. Acts ch. 287). The new provisions defined what it means to be rehabilitated and contained the following statements of public policy:

(1) Spouses have traditionally strengthened the family unit through private arrangements whereby one (1) spouse focuses on nurturing the personal side of the marriage, including the care and nurturing of the children, while the other spouse focuses primarily on building the economic strength of the family unit. This arrangement often results in economic detriment to the spouse who subordinated such spouse's own personal career for the benefit of the marriage. It is the public policy of this state to encourage and support marriage, and to encourage family arrangements that provide for the rearing of healthy and productive children who will become healthy and productive citizens of our state.

(2) The general assembly finds that the contributions to the marriage as homemaker or parent are of equal dignity and importance as economic contributions to the marriage. Further, where one (1) spouse suffers economic detriment for the benefit of the marriage, the general assembly finds that the economically disadvantaged spouse's standard of living after the divorce should be reasonably comparable to the standard of living enjoyed during the marriage or to the post-divorce standard of living expected to be available to the other spouse, considering the relevant statutory factors and the equities between the parties.

**Tenn. Code Ann. § 36-5-121(c).** The statute now provides, "To be rehabilitated means to achieve, with reasonable effort, an earning capacity that will permit the economically disadvantaged spouse's standard of living after the divorce to be reasonably comparable to the standard of living enjoyed during the marriage, or to the post-divorce standard of living expected to be available to the other spouse, considering the relevant statutory factors and the equities between the parties." **Tenn. Code Ann. § 36-5-121(d)(2).**

Keeping all these principles in mind, we now return to the facts of this case. The trial court's memorandum opinion, which was attached to the original divorce decree, contained a lengthy and detailed analysis of the facts and the law applicable to its alimony decision, and

a specific discussion of each statutory factor relevant to the alimony analysis. We will likewise discuss the statutory factors and the extent to which they are relevant to this case.[10]

**(1) The relative earning capacity, obligations, needs, and financial resources of each party, including income from pension, profit sharing or retirement plans and all other sources**

The trial court found that Husband possesses a greater earning capacity than Wife, as it specifically stated that Husband's earning capacity "far outstrips" that of Wife. The court found that Husband "makes and can make" $400,000 per year and that Wife makes "around" $50,000 per year. In response to Husband's motion to alter or amend, however, the trial court entered an amended order in which it noted that Wife had chosen to work part-time during the marriage and that she could work full-time in the future, and, the court added, "She is capable of earning at least $75,000.00 if she worked full time." We agree that Husband's earning capacity greatly surpasses Wife's, but we disagree with the trial court's specific findings as to the parties' earning capacities.

Wife had worked as a nurse throughout the twenty-five year marriage with the exception of the three-year period when she worked in the dental office with Husband. Wife testified that she began working four days per week, instead of full-time, in 2008, and that she was still working four days per week, or 33 hours per week, at the time of trial in 2011. Wife testified that she works "in the surgery field" for a surgeon. She testified that she earned about $43,000 in 2009 and in 2010 from her employment as a nurse, and that she was earning $47,000 at the time of trial in 2011.[11] Wife testified that her current gross monthly income was $3,917. Surprisingly, there was no testimony as to Wife's income when she had worked full-time in the past.[12] Husband testified at trial that Wife has an earning potential "much greater" than what she was currently earning. When asked to elaborate, he simply said, "She works part-time, she's a certified operating room supervisor. For example, my

---

[10] Tennessee Code Annotated section 36-5-121(i) states, "In determining whether the granting of an order for payment of support and maintenance to a party is appropriate, and in determining the nature, amount, length of term, and manner of payment, the court shall consider all relevant factors, including" the twelve specific factors which we will list in our analysis.

[11] Wife testified that in 2009, her income tax return showed a total income of $61,000, but that $17,300 of that amount was due to income that the dental practice paid her, basically as a tax write-off, and only $43,700 was from her employment as a nurse.

[12] The record does contain the parties' joint tax returns from 2004, 2005, and 2006, which list Wife's occupation as "Office Mgr./Nurse." Inexplicably, however, Wife's W2's from her current employer only show $1,962 in income for 2004, $7,166 in income for 2005, and $21,843 in income for 2006. **(Ex.119-121).**

sister's just a regular RN, she works at the VA, and she's reporting twice what [Wife's] reporting. If my sister had those credentials at the VA, she'd be making $100,000 a year."

As for Husband's earning capacity and financial resources, he received compensation from the dental practice of $498,000 in 2008, $408,000 in 2009, and approximately $435,073 in 2010, the year before trial.[13] In addition to this compensation, Husband received $6,000 per month in rent from the dental practice, for a total of around $72,000 in rent in each of those years. Husband acknowledged that the combined amount of his salary and rent from the dental practice for 2010 exceeded $500,000.

In our view, the evidence at trial demonstrated that Husband's earning capacity was far greater than $400,000, as the trial court found. It is not clear how the trial court reached its decision as to Husband's earning capacity, but we note that in the portion of the trial court's order calculating *child support*, for a certain period before the parties' daughter turned eighteen, the trial court calculated Husband's income at $400,488 per year. It appears that for purposes of child support, the trial court considered Husband's income over the two-year period at issue, then reduced his income by the cost of the parties' daughter's private school tuition, $15,600, and further reduced it by $12,645 due to counseling expenses for the daughter that Husband paid during that period. There was apparently no consideration of the rent Husband receives from the dental practice. For purposes of the alimony analysis, the statute requires courts to consider the "financial resources of each party, including income from pension, profit sharing or retirement plans *and all other sources*." Tenn. Code Ann. § 36-5-121(i)(1) (Emphasis added). When calculating income for purposes of alimony, "it is inappropriate to focus on one source of income when the party has multiple sources of income." *Jekot v. Jekot*, 362 S.W.3d 76, 82 (Tenn. Ct. App. 2011). Thus, we find that it would be inappropriate to calculate Father's earning capacity, for purposes of alimony, by looking only to the two-year period that the court considered for purposes of child support, reducing Father's income by private school tuition and counseling expenses that were incurred during that period, and failing to consider the substantial rent payment that Husband receives each month.

We also believe that it is a stretch to find that Wife is able to earn $75,000 working full-time, when, at the time of trial, she had nearly twenty-five years of experience as a nurse and was already working four days per week, for a total of 33 hours per week, earning no

---

[13] In 2007, Husband received less than $400,000 in compensation from his dental practice, but according to Wife's expert, as owner of the dental practice, Husband could have paid himself as much as $483,491 in compensation, if he had chosen to do so. The report of Husband's expert confirmed that, as controlling owner of the practice, Husband had the ability "to increase or decrease his compensation based on the available distributable cash flows of the Company."

more than $47,000.  As Wife argued in her post-trial motions, it is doubtful, to say the least, that Wife could add nearly $30,000 to her earning capacity simply by adding one additional workday to her current schedule.  There was no testimony, to our knowledge, regarding what Wife earned when she worked full-time in the past, or what she was expected to earn if she returned to work full-time in the future.  The only proof to suggest that Wife's earning capacity could increase came from Husband's brief comparison of Wife to his sister, who, he said, works "at the VA" as "just a regular RN," and "she's reporting twice what [Wife's] reporting."  There was no mention of where Husband's sister lives or works, or whether such an opportunity would be feasible for Wife in her current location.  Husband said, "If *my sister* had those credentials at the VA, she'd be making $100,000 a year," but notably, he did not testify that *Wife* could earn $100,000 per year with her credentials.

In sum, we agree with the trial court's express finding that Wife is the "economically disadvantaged spouse," but we find that the disparity in the parties' earning potentials is wider than that found by the trial court.

As for the parties' obligations and needs, the trial court recognized that in order to run the dental practice and maintain the lifestyle to which he was accustomed, Husband's needs were "great," but it also found that Wife's needs, based upon her prior lifestyle, were "significant."  Wife's income and expense statement listed a gross monthly income of $3,917 and monthly expenses of $9,528.[14]  Thus, Wife testified that she had a  shortfall after considering withholdings of $6,878 per month.  Wife testified that she was seeking an award of $10,000 per month in alimony in futuro, which, according to her calculations, would be about 24% of Husband's gross monthly income, including what he receives in rent from the dental practice.[15]

---

[14]  Husband questioned Wife at trial about the necessity of some of her expenses, such as $2,000 per month for home maintenance.  According to Wife, this amount covered mowing, pool expenses, security system expenses, and repairs.  She testified that she had experienced problems with the home's plumbing and pool pumps, and she said she could bring her bills to demonstrate that it would cost her that much to maintain the home.  She testified that she calculated her monthly expense statement using her average monthly expenditures based upon her receipts over an eleven-month period.  The trial court did not make any finding regarding the necessity or frivolity of the parties' expenses, and we will not second-guess the necessity of the parties' expenses on appeal.  It was undisputed that the parties were accustomed to living a lavish lifestyle.

[15]  We were unable to locate in the voluminous record a statement of Husband's monthly income and expenses.  In the division of marital property, Husband was awarded the real property where the dental practice is located, so he would continue to receive after the divorce the $6,000 per month in rental payments in addition to his compensation each month.  The loan against the property had a balance of around $129,000 at the time of trial, and it appears that the monthly loan payment was around $1,300.  The trial court valued

(continued...)

**2) The relative education and training of each party, the ability and opportunity of each party to secure such education and training, and the necessity of a party to secure further education and training to improve such party's earnings capacity to a reasonable level;**

Regarding this factor, the trial court noted that Husband is a dentist and that Wife is a nurse for an ear nose and throat doctor. The trial court further found that, "[g]iven the age of the parties it is unreasonable to believe that the Wife will be able to level the playing field to draw even with the Husband in education and training." The trial court also specifically found, at least in its initial order, that Wife "is not able to be rehabilitated" and "will not be able to improve her earnings in such a way that she will keep pace with the Husband's ability to earn."

From our review of the record, there was no proof at trial about either party needing to obtain additional education or training in order to improve his or her earning capacity. Wife will simply need to transition her schedule from part-time to full-time.

**(3) The duration of the marriage;**

The trial court found that this marriage was of a long duration such that it would support an award of alimony in futuro. We agree, as the parties were married for twenty-five years before the divorce complaint was filed.

**(4) The age and mental condition of each party;**

The trial court found that both parties are in their 50's and that "the age of the parties preponderates against rehabilitation of the Wife to the level of Husband." We note that Wife testified at trial that she was 48 years old, and Husband, by our calculation, had just turned 50 at the time of trial.

Regarding mental condition, the trial court noted that it did not hear expert proof as to the parties' mental conditions, but it added, "Personal evaluations of the conduct of the parties notwithstanding, the Court finds that the mental condition of the parties is not such as to otherwise justify a greater or lesser award of alimony." We agree with this conclusion.

---

[15](...continued)
the equity interest in the real property at $326,000, apparently concluding that the fair market value of the property was around $455,000.

**(5) The physical condition of each party, including, but not limited to, physical disability or incapacity due to a chronic debilitating disease;**

Husband testified at trial that he suffers from tendinitis and carpal tunnel syndrome and that he may be a candidate for surgery in the near future. He claimed that these conditions were affecting his ability to perform certain dental procedures at work. Wife testified that she suffers from some back pain, which is likely arthritis, but that it had not interfered with her ability to work.

The trial court's order noted Husband's claim of "a limiting physical condition that as of yet has not born itself out." The court found that both parties "are aging in a normal way and that there are inherent physical risks in the profession of dentistry and nursing." However, the court said it could not "in good conscience make a finding that these parties are limited in any way physically." According to the trial court, the parties appeared "to be healthy and physically active adults who enjoy scuba diving, power boating, riding four wheelers, and flying airplanes." Considering the trial judge's unique ability to observe the witnesses and their demeanor while testifying about their conditions, we find no error in the trial court's conclusion.

**(6) The extent to which it would be undesirable for a party to seek employment outside the home, because such party will be custodian of a minor child of the marriage;**

The trial court found this factor inapplicable, as the parties' child was 19 years old and in college. The court found there is no reason the parties cannot maintain full-time employment going forward. We agree.

**(7) The separate assets of each party, both real and personal, tangible and intangible;**

The trial court noted that both parties have separate property, "but not to such an extravagant amount that the court should alter the alimony considerations in this case." Wife has some inheritance, and Husband has his professional goodwill as a dentist. We agree with the trial court's analysis of this factor.

**(8) The provisions made with regard to the marital property, as defined in § 36-4-121;**

Regarding this factor, the trial court noted that Wife's share of the marital estate would exceed one million dollars. The court noted that she would receive "a paid for home

-33-

and a significantly smaller portion of the marital debt of the parties," therefore, she would be "in a good position to be able to be comfortable going forward." The court found that Husband would also receive a share of the marital estate valued at over one million dollars, and that he, too, could be comfortable going forward, although he would have a greater share of the marital debt due largely to the fact that it was tied to the dental practice. The trial court then made the following observation:

> The net effect of the equitable division of the marital estate would in most cases work to limit the amount of alimony assigned by the court. However, these parties lived what can only be seen as a lavish lifestyle. If the Court analyzes the case in light of the lifestyle they led, even this big a stake in marital assets will not guarantee the lifestyle continues.

In sum, the trial court found that Wife could not be rehabilitated even with the leveling of the marital assets. But, the court also added that it was giving this factor "less weight" than some of the other factors.

We find that the parties received comparable shares of the sizeable marital estate.

### (9) The standard of living of the parties established during the marriage;

The trial court found that the parties enjoyed a "lavish" and "extremely high lifestyle" during the marriage, as the parties "did what they wanted to do when they wanted to do it and were industrious enough and lucky enough to be able to do so." The court also found that Wife would be unable to maintain the standard of living to which she was accustomed without an award of alimony. We agree with this assessment.

Wife testified that the parties "just did whatever we wanted to whenever, it didn't matter," and that she could not think of anything she "wanted for." The parties had a housekeeper from the time their child was born in 1992 until the time of the divorce. They sent their daughter to a very expensive private boarding school. The parties furnished their home with expensive antiques, and they owned a collection of antique war memorabilia and guns. They owned expensive jewelry, a ski boat and boat lift, several all-terrain vehicles, a motorcycle, and an airplane. Wife testified that the parties took trips in their airplane three to four times a month during the marriage. Sometimes, she said, the parties would fly to Nashville just to have dinner, or to Bowling Green, Memphis, Knoxville, or Chattanooga. Other times, they would fly to places such as the Bahamas, Destin, Charleston, Savannah, Petersburg, or Virginia. Wife testified that the parties also took two to three vacations per year to places such as Turks & Caicos, Aruba, Curacao, Bonaire, Cozumel, Cancun, Saint John, Saint Thomas, and Grand Cayman, mostly to go scuba diving. Wife testified that, on

a nurse's salary, she was not able to continue flying "on a whim" or taking vacations like she did during the marriage. Wife testified that she had only been on one vacation since the divorce complaint was filed nearly two years earlier, when she went on a trip to Hawaii that had been planned before the divorce proceedings arose. Wife testified that her lifestyle had changed in "a lot" of ways since the divorce proceedings began, and as further examples she stated that she no longer had a housekeeper, and she was not able to "eat out" nearly as much or shop as often.

Husband testified that his girlfriend and her daughter live with him, and that he pays for all of their utility bills, some of their grocery bills, and most of their dining expenses. He acknowledged that he had given his girlfriend diamond earrings and a bracelet during the divorce proceedings. Husband had flown his airplane to Destin at least eight times during the divorce proceedings, and he had also flown to Sevierville, Memphis, and Tunica. He admitted that he went on many of these trips with his girlfriend. Husband also conceded that he paid to have a brand new pearl leather interior installed in his airplane during the divorce proceedings.

Husband's girlfriend similarly testified that Husband had given her gifts such as jewelry and that they had gone on numerous trips together in Husband's airplane during the divorce proceedings, including trips to Memphis, Pittsburgh, Knoxville, Chattanooga, and Tunica, and between five and ten trips to Destin. She testified that Husband paid for the parties' accommodations in Destin on each trip.

Considering all of this evidence, we agree with the trial court's conclusion that the parties lived a lavish lifestyle during the marriage. We also agree with the court's finding that Wife will be unable to continue living a similar lifestyle without an award of alimony. Husband, on the other hand, was able to continue living a lavish lifestyle during the divorce proceedings, and the evidence does not suggest that his lifestyle would drastically diminish after the divorce decree was entered.

> **(10) The extent to which each party has made such tangible and intangible contributions to the marriage as monetary and homemaker contributions, and tangible and intangible contributions by a party to the education, training or increased earning power of the other party;**

The trial court found that both parties had made substantial contributions relevant to this factor. The court noted that Wife worked as a nurse while Husband went to dental school, and that she helped support Husband in the dental practice and in her own career. The court also noted that Husband had contributed substantial hours and effort to the marital estate due to his education and training. We agree with the court's analysis of this factor.

-35-

Both parties made substantial contributions to the marriage, and Wife, in particular, made substantial contributions to Husband's education, training, and increased earning power by working while he attended dental school, leaving her job for a three-year period to assist Husband with starting his own practice, and continuing to do the bookkeeping for the practice after she returned to work as a nurse.

**(11) The relative fault of the parties, in cases where the court, in its discretion, deems it appropriate to do so; and**

The trial court acknowledged that both parties had urged the court to consider the fault of the other party in its alimony analysis. However, the court decided to give fault "very little weight if any" in its decision. The court found that both parties' fault had contributed to the breakdown of the marriage, and therefore, the court concluded that it would "muddy" the analysis to include a discussion of fault. As the trial court put it, "Suffice it to say, there is enough fault to go around." We agree and find no error in this decision.

**(12) Such other factors, including the tax consequences to each party, as are necessary to consider the equities between the parties.**

The trial court stated that it had considered the tax consequences of its alimony decision along with "other factors," and the court explained that it had relied upon all of the statutory factors in making its ultimate decision. The trial court said it was "most heavily" relying on the need of the Wife to maintain the lifestyle to which she was accustomed, and the ability of Husband to pay alimony. The court found that Wife would be unable to maintain her standard of living without an award of alimony. As previously noted, the court also concluded that it was "unreasonable to believe that the Wife will be able to level the playing field to draw even with the Husband in education and training," and it specifically found in its initial order that Wife "is not able to be rehabilitated" and "will not be able to improve her earnings in such a way that she will keep pace with the Husband's ability to earn." As such, the court's initial decree awarded Wife $6,000 per month in alimony in futuro.

In the trial court's amended decree, entered in response to Husband's motion to alter or amend, the court again found that "wife is the economically disadvantaged spouse." However, the court said it had concluded that its award of alimony in futuro was "inconsistent" with *Gonsewski* and with *Crabtree*. Specifically, the trial court stated, "In light of *Gronsewski* [sic] and its reasoning using the *Crabtree* case, the Court is not inclined to award alimony in futuro. This case closely resembles *Crabtree* in its underlying facts. Given the intent of *Gronsewski* [sic] the Court believes it would be error to allow for alimony in futur[o] on these facts." The trial court explained that when making its initial alimony

award, the court had "relied heavily on the economic disparity of the parties" and "relied most heavily on the demonstrated increased earning capacity of the husband and the lifestyle that his increased earning capacity had allowed the parties to enjoy during the course of their marriage," in addition to the fact that "the wife could not reach economic equality with the husband due to his advanced education." The trial court concluded, "This reliance is misplaced based upon a close reading of [*Gonsewski*]." We disagree.

"'[N]o fixed rule can be laid down by which every case is to be governed' when determining the nature and amount of alimony." *Gonsewski*, 350 S.W.3d at 107 (quoting *Stillman v. Stillman*, 66 Tenn. (7 Baxter) 169, 183 (1874)). Our Supreme Court has stated that despite the legislative preference in favor of rehabilitative alimony, "trial courts should not refrain from awarding long-term support when appropriate under the enumerated statutory factors." *Bratton v. Bratton*, 136 S.W.3d 595, 605 (Tenn. 2004) (citing *Robertson*, 76 S.W.3d at 341–42). "'The statutory preference for rehabilitative support does not entirely displace other forms of spousal support when the facts warrant long term or more open-ended support.'" *Id.* (quoting *Anderton v. Anderton*, 988 S.W.2d 675, 682 (Tenn. Ct. App. 1998)). Tennessee Code Annotated section 36-5-121(d)(2) states that "[i]t is the intent of the general assembly that a spouse, who is economically disadvantaged relative to the other spouse, be rehabilitated, *whenever possible*, by the granting of an order for payment of rehabilitative alimony." (emphasis added). "In determining how to measure a former spouse's economic rehabilitation, or its feasibility, it is important to note that the legislature has supplied the definition the courts are to use[.]" *Owens v. Owens*, No. M2012–01186–COA–R3–CV, 2013 WL 3964793, at *3 (Tenn. Ct. App. July 30, 2013). According to the statute, "To be rehabilitated means to achieve, with reasonable effort, an earning capacity that will permit the economically disadvantaged spouse's standard of living after the divorce to be reasonably comparable to the standard of living enjoyed during the marriage, or to the post-divorce standard of living expected to be available to the other spouse, considering the relevant statutory factors and the equities between the parties." **Tenn. Code Ann. § 36-5-121(d)(2).** Thus, alimony in futuro "may be awarded when the court finds that there is relative economic disadvantage and that rehabilitation is not feasible, meaning that the disadvantaged spouse is unable to achieve, with reasonable effort, an earning capacity that will permit the spouse's standard of living after the divorce to be reasonably comparable to the standard of living enjoyed during the marriage, or to the post-divorce standard of living expected to be available to the other spouse, considering the relevant statutory factors and the equities between the parties." **Tenn. Code Ann. § 36-5-121(f)(1).** The basic question, then, is whether Wife can generate enough income to provide a pre-divorce standard of living, or one comparable to Husband's post-divorce standard of living. *See Owens*, 2013 WL 3964793, at *3.

We agree with the trial court's original findings in this case that Wife "is not able to be rehabilitated," that it is "unreasonable to believe that the Wife will be able to level the playing field to draw even with the Husband in education and training," and that she "will not be able to improve her earnings in such a way that she will keep pace with the Husband's ability to earn." It is important to note that the trial court did not abandon these findings in its amended order, it simply found that its reliance upon these facts was "misplaced." We find that the trial court had it right the first time, and that it was not error for the trial court to rely upon these facts in deciding to award alimony in futuro. Wife simply cannot achieve, with reasonable effort, an earning capacity that will permit her standard of living after the divorce to be reasonably comparable to the standard of living she and Husband enjoyed during the marriage or to the post-divorce standard of living expected to be available to Husband. Thus, she cannot be rehabilitated within the meaning of the alimony statute.[16]

In its amended order, the trial court stated that an award of $4,300 per month in rehabilitative alimony for four years would allow Wife "an opportunity to rehabilitate herself." The trial court noted that Wife had demonstrated "an ability to work and provide income for herself," and she would be receiving a share of the marital estate valued at over one million dollars. The trial court also added, in its amended order, "The wife could pursue further educational opportunities and increase her earning capacity if she chooses to do so even though the marriage was of long duration and the parties are somewhat older than the parties in the *Crabtree* case." There was no testimony at trial, that we can recall, or that the parties have cited, regarding further educational opportunities available to Wife that would enable her to increase her earning capacity. Respectfully, we disagree with the trial court's conclusion that the aforementioned facts demonstrate that Wife can be rehabilitated within the meaning of the alimony statute.

---

[16] We note that in *Gonsewski*, the Supreme expressly noted that the record before it was "silent on what, if anything, Wife could or could not do to alter her earning capacity to permit her standard of living after the divorce to be reasonably comparable to the standard of living during the marriage." 350 S.W.3d at 111. The parties had presented no evidence "regarding the prospect or feasibility of Wife making any 'reasonable effort' to rehabilitate herself, and aside from the parties' income and expense statements, there was "little evidence" presented regarding the parties' standard of living during the marriage, "whether lavish, frugal, or somewhere in between," and no evidence regarding the post-divorce standard of living expected to be available to the husband. *Id.* The Supreme Court said it was "not inclined to speculate about these matters, which relate directly to the statutory standard for awarding permanent alimony." *Id.* It is "incumbent" upon the party seeking alimony "to offer proof establishing the nature and extent of his [or her] need for alimony," and "absent evidence regarding need, as well as the other factors pertinent to the parties' circumstances, alimony should not be awarded." *Mayfield v. Mayfield*, 395 S.W.3d 108, 120 (Tenn. 2012).

Unlike *Gonsewski*, in this case, the parties presented a great deal of evidence regarding their standard of living during the marriage and the standard of living of each party during the divorce proceedings. Like *Gonsewski*, however, there was little to no proof in this case regarding the opportunities available to Wife to increase her earning capacity or rehabilitate herself.

At the time of trial, Wife's gross monthly income was $3,917, and she testified that she had a monthly shortfall after considering withholdings and expenses of $6,878 per month. Wife's income was expected to increase somewhat when she altered her schedule from four days per week to full-time, but there was no evidence regarding how much her income would increase. Husband did not testify regarding his gross monthly income, aside from the $6,000 in rent he receives from the practice, but during 2010, the year prior to trial, he received $435,073 in compensation, which would equate to $36,256 per month. Thus, Husband's monthly income from compensation and rent combined would easily exceed $40,000 per month.

We recognize that our role in reviewing an alimony award is to determine whether the trial court applied the correct legal standards and reached a decision that is not clearly unreasonable. *Gonsewski*, 350 S.W.3d at 105-106. We will not second-guess a trial court's decision absent an abuse of discretion, which occurs "when the trial court causes an injustice by applying an incorrect legal standard, reaches an illogical result, resolves the case on a clearly erroneous assessment of the evidence, or relies on reasoning that causes an injustice." *Id.* In this case, however, considering the trial court's express recognition of the great economic disparity between Husband and Wife, its acknowledgment of Wife's inability to reach economic equality with Husband or maintain the lifestyle to which the parties were accustomed, the trial court's fundamental alteration of its award in light of its reading of *Gonsewski*, and considering, to some extent, the trial court's skewed findings regarding each party's earning capacity, we find that the trial court abused its discretion in altering its original alimony award and modifying the award to $4,300 in rehabilitative alimony for four years. We hereby vacate the trial court's amended order to the extent that it modified the original award, and we reinstate the award of $6,000 per month in alimony in futuro as per the original divorce decree.

### D. Attorney's Fees

Finally, Wife argues that the trial court erred in declining to order Husband to pay her attorney's fees. The Supreme Court in *Gonsewski* set forth the following principles that impact our review of the trial court's decision:

It is well-settled that an award of attorney's fees in a divorce case constitutes alimony in solido. See Tenn. Code Ann. § 36-5-121(h)(1) ("alimony in solido may include attorney fees, where appropriate"); *Herrera v. Herrera*, 944 S.W.2d 379, 390 (Tenn. Ct. App. 1996). The decision whether to award attorney's fees is within the sound discretion of the trial court. *Crabtree*, 16 S.W.3d at 361; *Kincaid v. Kincaid*, 912 S.W.2d 140, 144 (Tenn. Ct. App. 1995). As with any alimony award, in deciding whether to award

attorney's fees as alimony in solido, the trial court should consider the factors enumerated in Tennessee Code Annotated section 36-5-121(i). A spouse with adequate property and income is not entitled to an award of alimony to pay attorney's fees and expenses. *Umstot v. Umstot*, 968 S.W.2d 819, 824 (Tenn. Ct. App. 1997). Such awards are appropriate only when the spouse seeking them lacks sufficient funds to pay his or her own legal expenses, see *Houghland v. Houghland*, 844 S.W.2d 619, 623 (Tenn. Ct. App. 1992), or the spouse would be required to deplete his or her resources in order to pay them, see *Harwell v. Harwell*, 612 S.W.2d 182, 185 (Tenn. Ct. App. 1980). Thus, where the spouse seeking such an award has demonstrated that he or she is financially unable to procure counsel, and where the other spouse has the ability to pay, the court may properly grant an award of attorney's fees as alimony. See *id.* at 185.

*Gonsewski*, 350 S.W.3d at 113.

On appeal, Wife argues that she was required to deplete her separate and personal assets, including her inheritance account, in order to pay attorney's fees and litigation expenses exceeding $145,415.97. Wife testified that she still owed around $35,000 toward her expenses and fees at the time of trial. Wife acknowledges that Husband also incurred nearly $125,000 in attorney's fees, but, she points out that Husband had paid all of his attorney's fees from marital assets prior to trial. Husband conceded at trial that in 2009, he paid $27,602 of his divorce-related legal fees from his dental practice account, but he claimed that his accountant later "made me back them out," with the exception of the fees that were related to appraising the dental practice. Regardless of the account from which his attorney's fees were paid, however, Husband admitted that he had already paid all of his attorney's fees using marital funds.

The trial court declined to award either party attorney's fees, stating that both parties were in a position to pay their own attorney's fees based upon the division of assets. Although we might be inclined to resolve this issue differently if we were deciding it in the first instance, we are not inclined to second-guess the trial court's decision under the circumstances. In our view, reasonable minds could disagree as to the propriety of awarding Wife her attorney's fees. On the one hand, Husband had already paid his attorney's fees using marital assets, and he thereby reduced the size of the marital estate to be divided. On the other hand, Wife clearly received a significant share of the marital estate and she has a separate inheritance account which provide her with the means to pay her attorney's fees. In addition, the divorce proceedings were lengthy and contentious, with the parties involving the trial court in trivial matters such as the withholding of mail and whether Husband and the daughter could retrieve their winter coats from the marital home, in addition to numerous

petitions for contempt. We cannot say that the trial court abused its discretion in declining to make an award of attorney's fees under these circumstances.

## IV. CONCLUSION

For the aforementioned reasons, the decision of the chancery court is hereby affirmed in part and reversed in part, and this matter is remanded for further proceedings consistent with this opinion. Costs of this appeal are taxed equally to the appellant, LeAnn Barnes, and her surety, and to the appellee, David Barnes, for which execution may issue if necessary.

_____
ALAN E. HIGHERS, P.J., W.S.